IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

STATIRIA SCOTT,

    Plaintiff,

v.                                                                                CASE NO. 1:14-cv-122-MP-GRJ

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals from a final decision of the Commissioner of Social Security ("the Commissioner") denying her application for supplemental security income. (Doc. 1). The Commissioner has answered (Doc. 9), and both parties have filed briefs outlining their respective positions. (Docs. 14, 15). For the reasons discussed below, it is recommended that the Commissioner's decision be affirmed.

### I. PROCEDURAL HISTORY

Plaintiff filed an application for supplemental security income ("SSI") on June 4, 2010, alleging a disability onset date of June 1, 2009, due to leg pain, depression, bipolar disorder, anxiety and panic attacks, short term memory, headaches, manic depression, and leg injury. (R. 190.) Plaintiff's application was denied initially and upon reconsideration. (R. 11.) An administrative law judge ("ALJ") conducted a hearing on August 23, 2012, and entered an unfavorable decision on November 8, 2012. (R.11-21.) The Appeals Council denied Plaintiff's request for review on May 10, 2014. ( R. 1-

3.) This action followed.

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4] However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with

---

[1] See 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from evidence on which the Commissioner relied).

sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The ALJ must follow five steps in evaluating a claim of disability.[8] First, if a claimant is working at a substantial gainful activity, he is not disabled.[9] Second, if a claimant does not have any impairment or combination of impairments which significantly limit his physical or mental ability to do basic work activities, then he does not have a severe impairment and is not disabled.[10] Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, he is disabled.[11] Fourth, if a claimant's impairments do not prevent him from doing past

---

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] 20 C.F.R. §§ 404.1520, 416.920. The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991).

[9] 20 C.F.R. § 404.1520(b).

[10] 20 C.F.R. § 404.1520(c).

[11] 20 C.F.R. § 404.1520(d).

relevant work, he is not disabled.[12] Fifth, if a claimant's impairments (considering his residual functional capacity ("RFC"), age, education, and past work) prevent him from doing other work that exists in the national economy, then he is disabled.[13]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[14] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[15] The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[16]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or

---

[12] 20 C.F.R. § 404.1520(e).

[13] 20 C.F.R. § 404.1520(f).

[14] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.
3d 1274, 1278 (11th Cir. 2001).

[15] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

[16] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

when the claimant cannot perform a full range of employment at the appropriate level of exertion."[17] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[18]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[19] Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[20] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

### III. SUMMARY OF THE RECORD

#### A. Medical Evidence

Plaintiff's medical records detail an incident that occurred in March of 2006 when Plaintiff's domestic partner attacked her, stomping on her leg. In the attack, Plaintiff suffered a broken leg (displaced tibia fracture) and crushed ankle. (R. 333.) She began to suffer mental issues associated with the attack, including depression and post

---

[17] Wolfe v. Chater, 86 F.3d 1072, 1077 (11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[18] Walker, 826 F.2d at 1003.

[19] Wolfe, 86 F.3d at 1077-78.

[20] See id.

traumatic stress disorder.

After the attack, Plaintiff ankle was reconstructed and her tibial fracture was treated with the insertion of an intramedullary nail. In 2010, a physical exam evidenced symmetrical longitudinal alignment of her legs, but a slight internal rotation of her right leg as compared to her left. Plaintiff had protective sensation, intact motor function, and adequate circulation. Plaintiff then underwent surgery to remove the screws in her leg from the reconstruction that same year. (R. 327-332.)

Even after the surgery, Plaintiff continually reported pain in her foot and ankle. In a December 2010 evaluation, Dr. Murphy found that Plaintiff was ambulatory with a single-point cane, although favoring her left leg, and that she had no significant joint deformity. Dr. Murphy found that Plaintiff had tenderness to palpation to the right knee, mid and lateral joint line, no effusion or patellar apprehension, and mild crepitus but no instability or laxity. Dr. Murphy also noted that Plaintiff passively maintained her right foot in an inverted position. (R. 400-402.)

Electrodiagnostic studies performed on Plaintiff in January 2011 were normal. (R. 439-441.) X-rays of Plaintiff's leg showed that the fracture had healed without acute process or abnormalities to the ankle or foot. (R. 508.)

In January 2011, Plaintiff began rehabilitation to decrease her pain and improve her range of motion and strength to enable her to walk for longer periods of time. (R. 458.) The physical therapist noted that Plaintiff reported the pain in her leg as a 10 on the pain scale and that the problem was unchanging. (R. 463-467.) Plaintiff could not walk for longer than 10 minutes at a time without pain, and squatting or kneeling was not possible. *Id.* Plaintiff was discharged from therapy in June 2011 due to missed

appointments.  (R. 654.)

In March of 2012 Plaintiff was prescribed a cane "to sport her walking and prevent frequent spraining and falling."  (R. 552)

With respect to Plaintiff's mental health impairments, Plaintiff was voluntarily hospitalized in May of 2009 at Meridian Behavioral.  The evaluator noted that Plaintiff had suicidal ideations, was depressed, sad, and crying, and was nervous and anxious.  Plaintiff's  GAF at the time of her admittance was 35.  (R. 624-639.)

After her hospitalization, Plaintiff continued treatment at Meridian.  Her treatment plan in June 2009 noted that she had Major Depressive Disorder, recurrent, moderate, and that she felt sad, had trouble maintaining relationships, had hallucinations, and heard voices that she said told her she was not worth anything.  Plaintiff's doctor in July 2009 recorded that Plaintiff had paranoid thoughts.  Plaintiff's doctor continued her on the medications Depakote, Lexapro, and Bepreve. ( R. 620-622.)

On June 26, 2009, Meridian staff created a treatment plan for Plaintiff.  Plaintiff's case manager wrote that she was "very depressed for the last three years" and noted that she walked off her last job after four months because she could not stand being around people. The case manager assessed Plaintiff with bipolar disorder and manic depression.  (R. 625-626.)

In July 2009, Plaintiff told ARNP MacLeod at Meridian that her medication was not working.  (R. 618-619.)  Nurse MacLeod assessed Plaintiff with schizophrenia and depression and noted that Plaintiff reported paranoid thoughts and auditory hallucinations.  In September and November 2009, Plaintiff again reported auditory hallucinations to Nurse MacLeod. (R. 614-615.)

Meridian updated Plaintiff's treatment plan in December 2009. Plaintiff reported that she was living with other people, which stressed her. However, Plaintiff reported that the medication changes caused her to feel "much better." She still had no energy or motivation, and believed her environment was making her depressed. (R. 627-629.)

Plaintiff continued treatment at Meridian throughout 2010. In January, Nurse MacLeod noted that Plaintiff complained of depression and "[didn't] care one way or another." (R. 362.) Nurse MacLeod found that Plaintiff had auditory hallucinations and a depressive affect. Plaintiff's provider in April found that her thought process was organized and her judgment was good. (R. 360-361.) In June, Plaintiff reported to ARNP Short that she had excessive worry, decreased energy, increased tearfulness, worsening insomnia, frequent panic attacks, agitation, increased hallucination, and nightmares and flashbacks. (R. 358-359.) Nurse Short saw Plaintiff again in July. At that visit, Plaintiff reported a depressed mood, stress and anxiety, panic, and paranoid thoughts, but Nurse Short found that Plaintiff's judgment and insight were fair to good. (R. 356-357.)

Dr. Zhang began treating Plaintiff at Meridian in August of 2010. He wrote that Plaintiff previously had schizoaffective disorder and had returned for increased depression, tiredness, and decreased energy. Dr. Zhang found that Plaintiff's thought process was organized and her mood was "all right" but her affect was sad and discouraged. Dr. Zhang prescribed Zyprexa to improve Plaintiff's sleep and appetite, Wellbutrin for depression and low energy, Prazosin for nightmares, and continued Plaintiff on Klonopin for anxiety. (R. 354-355.)

During Plaintiff's next visit with Dr. Zhang in September Plaintiff reported some

improvement in her depression, sleep habits, nightmares, and appetite. (R. 352-353.) Plaintiff returned in January 2011. During this visit she reported that she had a hard time being around people, that she did not have emotion and did not want to hurt herself. (R. 474-475.) Dr. Zhang wrote in the progress notes that Plaintiff's nightmares were better with medication and her depression had increased.

In February 2011, Plaintiff reported to Dr. Zhang that she was a little bit depressed and her appetite was not great. (R. 476-477.) Dr. Zhang noted that Plaintiff's nightmares had increased since she began physical therapy. Plaintiff visited again in April 2011 and told Dr. Zhang that she had been distressed in the waiting room due to the noise. (R. 541-542.) During this visit Dr. Zhang found that she had auditory hallucinations. In May, Plaintiff stated that her daughter was missing school because Plaintiff did not like being around people and that she "feels somebody watching" her. (R. 539-540.) Dr. Zhang noted that Plaintiff had severe mood swims, nightmares, and paranoia. He also noted that she rested better during the daytime and did not complete tasks.

In July 2011, Plaintiff returned to Dr. Zhang reporting that she sees a lady in a white dress at her home. (R. 537-538.) Plaintiff stated, however, that her appetite was better and her nightmares were improving. Dr. Zhang found that Plaintiff has mood swings every day. In September, Plaintiff reported still seeing the lady in the white dress, but said that her mood was about the same and her nightmares were better. (R. 535-536.) Plaintiff continued to report that she did not want to be around people.

Plaintiff returned to Dr. Zhang in February of 2012, and told Dr. Zhang that she was "doing about the same after being back on meds." (R. 533-534.) Plaintiff's

appetite varied, and she was not happy. In April, Dr. Zhang found that Plaintiff was doing well on her medications and that her nightmares were less frequent. (R. 531-532.) However, Dr. Zhang reported that Plaintiff claimed to have severe mood swings when she stayed up during the day.

Dr. Zhang completed a Mental Residual Functional Capacity Assessment in May 2012. On the form Dr. Zhang found that Plaintiff had marked limitations in understanding and memory, moderate to marked limitations in sustained concentration and persistence, moderate to marked limitations in social interaction, and marked limitations in adaptation. (R. 599-601.)

Plaintiff's last visit to Dr. Zhang was in June 2012, when she reported having good days and bad days. (R. 606-607.) Plaintiff said that her nightmares were frustrating and her medications helped. Dr. Zhang's objective assessment of Plaintiff over the last two years evidenced that Plaintiff had fair appearance, appropriate manner, largely normal motor behavior and speech, grossly intact cognition, and an organized thought process.

Plaintiff was referred to Dr. Benton, a clinical psychologist, in October 2010 for a psychological evaluation. Among Plaintiff's chief complaints were her leg pain, irritable mood, recurring thoughts about her previous abuse, depressed mood, hypersomnia, and panic attacks. Plaintiff told Dr. Benton that she was unable to continue her previous work at a daycare because she was always paranoid and could not deal with the noise. Plaintiff represented that she was currently taking Zyprexa, Bupropion, and Klonopin, prescribed by Dr. Zhang, and that her medication and counseling were helpful. She reported being hospitalized for suicidal ideation the previous year. (R.

376-379.)

Dr. Benton found that Plaintiff was well-groomed and her eye contact was intermittent. Dr. Benton found that Plaintiff's thought processes were logical and goal oriented and there was no evidence of delusions or perceptual abnormalities. Dr. Benton opined that Plaintiff's mood was depressed but that she did not have suicidal ideation. Plaintiff was well oriented and her memory and abstract thinking intact. Dr. Benton opined that her judgment was grossly normal and insight was fair. Dr. Benton diagnosed Plaintiff with PTSD, Bipolar I Disorder, and MRE Depressed, severe without psychotic features, and recommended medication management and mental health counseling. (R. 376-379.)

In March 2011, a State agency consulting psychologist, Dr. Pack, reviewed Plaintiff's record and completed a Mental Residual Functional Capacity Assessment. Dr. Pak found that Plaintiff could understand, retain, and carry out simple, and some complex, instructions; consistently and usefully perform routine tasks on a sustained basis with minimal (normal) supervision; cooperate effectively with public and co-workers in completing simple tasks and transactions; and adjust to the mental demands of most new task settings. (R. 478-494.)

**B.    Hearing Testimony**

At the hearing, Plaintiff testified that she previously worked as a receptionist at Shands, as a preschool teacher, and in a daycare center. She left the daycare center because "it was becoming overwhelming."

Plaintiff testified that she has four children, including a 20 year old son, who helps her by taking her to appointments, cleaning the house, picking up his siblings

from school, cooking, and washing clothes.  Plaintiff helps her six-year-old son get ready for school, helps her children with homework, puts out their clothes, prepares dinner, puts them to bed, and sometimes walks them to the bus stop.  Her family takes her to the grocery store to go shopping once or twice a month and helps her take her children to doctor's appointments.  She testified that when the children are at school, she tries to freshen up the house, but most of the time she sleeps.

Plaintiff stated that she has nightmares during the night that keep her awake.  She usually does not walk in her neighborhood because she does not like interacting with a lot of people.  At the hearing, she said that she feels that everyone is trying to hurt her or her family, and she does not trust anyone.

Plaintiff was in individual counseling about six months ago, and represented that her doctor, Dr. Zhang, was supposed to discuss with her getting another counselor.  During questioning by her attorney, Plaintiff stated that she knew she was depressed because she used to "fix [herself] up," but she does not anymore.  She testified that she has a hard time concentrating and gets distracted.  She stated that her daily pain in her right leg rated a seven on a scale of one to ten.  She uses a cane, prescribed by the Health Department, whenever she goes out.  (R. 35-55.)

**C.    The ALJ's Findings**

The ALJ found that Plaintiff had the severe impairments of status post 2006 right tibial shaft fracture with 2010 hardware removal, an affective disorder, and post traumatic stress disorder.  The ALJ found, however, that none of the impairments met or medically equaled the severity of a listed impairment.  The ALJ found that Plaintiff's residual functional capacity included the ability to perform sedentary work, and that she

could not push/pull with her feet, or climb ropes ladders, of scaffolds. The ALJ found that Plaintiff could occasionally climb ramps and stairs, bend, balance, stoop, squat, crouch, crawl, and kneel. The ALJ concluded that Plaintiff had no limitations on the use of upper extremities or visual or communicative deficits. She limited Plaintiff to avoiding heights, dangerous machines, and vibrations, and stated that any job should not involve production paced requirements. Finally, the ALJ stated that Plaintiff could work near people, but the job should involve things instead of people.

Based upon this RFC finding and vocational expert testimony the ALJ found that Plaintiff could not return to her past relevant work. However, relying upon the testimony of the VE the ALJ found that Plaintiff could perform other sedentary jobs existing in significant numbers in the national economy, such as a document preparer, lens inserter and trimmer. Accordingly, the ALJ found that Plaintiff was not disabled.

## IV.  DISCUSSION

Plaintiff raises two issues on appeal: (1) whether the ALJ erred by failing to give "great weight" to her treating physician's opinion; and (2) whether the ALJ erred by failing to consider Plaintiff's impairments in combination.

### A.   The ALJ properly assessed the opinion of treating physician Dr. Zhang.

Plaintiff argues that the ALJ erred by assigning only limited weight to the mental RFC assessment completed by her treating physician, Dr. Zhang. She contends that because Dr. Zhang was a treating physician, his opinion should have been afforded "great weight" by the ALJ.

If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.[21] Nevertheless, the ALJ may discount the treating physician's opinion if good cause exists to do so.[22] Good cause may be found when the opinion is "not bolstered by the evidence," the evidence "supports a contrary finding," the opinion is "conclusory" or "so brief and conclusory that it lacks persuasive weight," the opinion is "inconsistent with [the treating physician's] own medical records," the statement "contains no [supporting] clinical data or information," the opinion "is unsubstantiated by any clinical or laboratory findings," or the opinion "is not accompanied by objective medical evidence."[23] If an ALJ rejects a treating physician's opinion, he must give explicit, adequate reasons for so doing, and failure to do so results in the opinion being deemed accepted as true as a matter of law.[24]

Plaintiff argues that the ALJ erred by failing to consider and properly weigh Dr. Zhang's opinion. However, contrary to Plaintiff's assertion, the ALJ clearly articulated her findings regarding why she was only affording Dr. Zhang's opinion limited weight.

The ALJ expressly stated that she accorded Dr. Zhang's opinion limited weight because (1) Dr. Zhang's treatment records did not support his opinion that Plaintiff had marked limitations; (2) Plaintiff's GAF scores from 2010 and 2012 disclosed only

---

[21] 20 C.F.R. § 404.1527(d)(2).

[22] *Hillsman v. Bowen*, 804 F.2d 1179, 1181 (11th Cir. 1986).

[23] *Phillips v Barnhart*, 357 F. 3d 1232, 1240-41 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991), (citing *Schnorr v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987)).

[24] *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986); *Marbury v. Sullivan*, 957 F.2d 837, 841 (11th Cir. 1992).

moderate symptoms or limitations in functioning in contrast to the marked limitations found by Dr. Zhang; (3) Dr. Zhang's opinion was inconsistent with the opinion of the State agency psychological consultant, which was better supported by the record; and (4) Dr. Zhang's opinion was not bolstered by the other substantive evidence of record, including Plaintiff's functional abilities as demonstrated by her daily activities. (R. 18-19.)

A review of the pertinent medical evidence shows that the ALJ's decision to afford Dr. Zhang's opinion limited weight was supported by substantial evidence. Dr. Zhang began treating Plaintiff at Meridian Behavioral Healthcare in August 2010, and the record reflects eleven separate visits. While Dr. Zhang's treatment notes recorded Plaintiff's subjective symptoms ranging from nightmares to visual hallucinations, Dr. Zhang's objective assessment of Plaintiff's mental state throughout the two year period was relatively benign. During each visit, Dr. Zhang assessed Plaintiff's cognition as grossly intact, her appearance as fair to good, her manner as appropriate, and her motor behavior as normal. (R. 353, 355, 475, 477, 532, 534, 536, 538, 540, 542, 607.) Dr. Zhang also found that Plaintiff's insight and judgment were fair to good and her thought process was organized. *Id.*  Notably, Dr. Zhang's progress notes reflect improvement in Plaintiff's condition over two years. For example, Dr. Zhang wrote that Plaintiff was "doing well with medication," "some improvement to her depression and sleep," and her "nightmares [are] better with [medication]." (R. 352, 475, 609.) Overall, Dr. Zhang's treatment records do not support his extreme mental RFC assessment, which included marked limitations in understanding and memory, moderate to marked limitations in sustained concentration and persistence, moderate to marked limitations

in social interaction, and marked limitations in adaption.

The ALJ further properly discounted Dr. Zhang's assessment because of the assessment overall was inconsistent with the substantive evidence of record. For example, the ALJ noted that Dr. Zhang's opinion was inconsistent with Plaintiff's GAF scores. While Plaintiff had low GAF scores[25] when she was voluntarily hospitalized in 2009, her GAF scores in 2010 and 2012 increased substantially to 57 and 58 respectively, which are in the GAF range denoting only moderate symptoms or limitations.

The ALJ also pointed out that Dr. Zhang's opinion was at odds with the opinion of the State agency psychological consultant, Dr. Pack. Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician is "that opinion has been properly discounted." *Cooper v Astrue*, 2008 WL 649244, at *3 (M.D. Fla. Mar. 10, 2008).

In this case Dr. Pack assessed Plaintiff with moderate to no limitations in understanding and memory, moderate to no limitations in sustained concentration and persistence, moderate to no limitations in social interaction, and moderate to no limitations in adaption. The ALJ concluded that Dr. Pack's findings were "consistent with medical records that document largely normal findings of multiple mental status examinations," including Plaintiff's October 2010 consultative examination by psychologist Dr. Benton. After the examination, Dr. Benton opined that Plaintiff was

---

[25] Three separate psychiatric evaluations, taken in May 2009 at the time of her voluntary hospitalization, rated her GAF as 40, 25, and 35. (R. 613, 633, 639.)

dressed appropriately, demonstrated logical and goal oriented thought process, displayed no evidence of delusions or perceptual abnormalities, displayed intact immediate, recent, and remote memory, and had fair insight and normal judgment, among other findings.

Finally, the ALJ noted that Dr. Zhang's opinion was inconsistent with Plaintiff's activities of daily living, including he ability to get her son get ready for school, helping her children with homework, putting out the children's clothes, preparing dinner, putting the children to bed, walking the children to the bus stop, grocery shopping, and cleaning.

In sum, the Court concludes that the ALJ did not err in affording only limited weight to Dr. Zhang's opinion.  The ALJ noted that Dr. Zhang's assessment of Plaintiff's mental RFC was inconsistent with his objective assessments of her mental state in his treating notes, which spanned a period of two years.  The ALJ further concluded that Dr. Zhang's mental RFC assessment was not supported by other medical evidence in the record, including Plaintiff's increasing GAF scores, the opinion of the State agency psychological consultant, and Plaintiff's activities of daily living.  Because the ALJ articulated adequate and specific reasons for discounting Dr. Zhang's opinion and the ALJ's reasons are supported by substantial evidence in the record, the Court concludes that the ALJ did not err in weighing Dr. Zhang's opinion.

**B.    The ALJ properly considered the combined effect of all of Plaintiff's impairments.**

Plaintiff argues that the ALJ failed to evaluate her as a whole person because no reasonable person could conclude that she would be able to work for eight hours a day,

five days a week. She contends that the ALJ did not properly consider the combined effect of her impairments.

"When a claimant has alleged [multiple impairments], a claim for [SSI] may lie even though none of the impairments, considered individually, is disabling."[26] The ALJ must "make specific and well-articulated findings as to the effect of the combination of impairments and to decide whether the combined impairments cause the claimant to be disabled."[27] The Eleventh Circuit has repeatedly held that an ALJ's finding regarding a claimant's "impairment or combination of impairments" establishes that the ALJ has considered the impact of the combined impairments.[28]

In this case, the ALJ clearly considered Plaintiff's impairments in combination. This is evidence by the ALJ's statement during step three of the sequential analysis that Plaintiff "does not have an impairment or a combination of impairments." As the Eleventh Circuit explained in *Wilson* this statement is sufficient to establish that the ALJ has considered the combined impact of all impairments. 284 F.3d at 1224-25. The ALJ further explicitly discussed both Plaintiff's mental and physical impairments in great detail throughout Step 4. Finally, the ALJ accounted for Plaintiff's physical and mental impairments in Plaintiff's RFC by limiting Plaintiff to sedentary work and prohibiting her from work with production requirements. The ALJ additionally stated that while Plaintiff could work around people, her work should involve objects.

---

[26] *Walker v. Bowen*, 826 F.2d 996, 1001 (11th Cir. 1987).

[27] *Id*.

[28] *Wilson v. Barnhart*, 284 F.3d 1219, 1224-25 (11th Cir. 2002); *Jones v. Dep't of Health & Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991); *Wheeler v. Heckler*, 784 F.2d 1073 (11th Cir. 1986).

Accordingly, the Court concludes that the ALJ properly considered Plaintiff's impairments in combination as evidenced by the ALJ's statement that she had considered the combined impairments and as evidenced by the ALJ's thorough discussion of Plaintiff's medical history of each impairment, and the ALJ's assessment in the RFC of limitations that pertained to each impairment.

## V.  CONCLUSION

For the foregoing reasons, it is respectfully **RECOMMENDED** that the decision of the Commissioner denying benefits to Plaintiff should be **AFFIRMED.**

**IN CHAMBERS** at Gainesville, Florida, this 11th day of May, 2015.

*s/Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

### NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**